IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NEFTAN MENDEZ,

       Plaintiff,               No. CIV S-08-2727 WBS DAD P

    vs.

K. WIN,  et al.,

       Defendants.        <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

       Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking relief under 42 U.S.C. § 1983.  Pending before the court are motions for summary judgment brought, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on behalf of defendants Rohrer, Rallos, Traquina and Basi.  (Doc. Nos. 30-31.) Plaintiff has filed oppositions to the motions and defendants have filed replies.

**BACKGROUND**

       Plaintiff is proceeding on his first amended complaint (Doc. No. 13) against defendants Rohrer, Rallos, Traquina, and Basi.  Therein, he alleges as follows.  In December of 2006 plaintiff was incarcerated in a California State Prison Conservation Camp.  At that time a blood test revealed that plaintiff had an elevated Prostate-Specific Antigen ("PSA") level, which is sign of prostate cancer.  Plaintiff was not informed of this test result.

In January of 2007 plaintiff was transferred to California State Prison-Solano ("CSP-Solano").  On January 24, 2007, defendant Dr. Basi ordered another PSA test for plaintiff which also showed that plaintiff had an elevated PSA level.  Again, plaintiff was not informed of this test result, nor was he scheduled for a follow-up appointment during the nine months he remained incarcerated at CSP-Solano.  During that time period plaintiff was considered for transfer to a prison outside of California.  Prisoners with chronic or serious medical conditions are excluded from consideration for transfer to prisons outside of California.

From February 2007 through June 2007 plaintiff had medical appointments with defendants Dr. Rohrer and Dr. Rallos.  Despite these appointments defendants Dr. Rohrer and Dr. Rallos never informed plaintiff of his abnormal PSA test results or of the possibility that he may have prostate cancer.  Similarly, defendant Dr. Traquina received copies of plaintiff's lab results showing the elevated PSA level but failed to ensure that plaintiff received follow-up care while he was incarcerated at CSP-Solano.

On September 18, 2007, plaintiff was transferred from CSP-Solano to the Tallahatchie County Correctional Facility, in Mississippi, without any mention of his elevated PSA level or possible prostate cancer.  After his arrival, the medical staff at the Tallahatchie County Correctional Facility took note of plaintiff's elevated PSA levels.

After additional testing, plaintiff was examined by Dr. Derek Niles, a urologist, on October 4, 2007.  Dr. Niles ordered a biopsy of plaintiff's prostate which was performed on October 11, 2007.  As a result of that biopsy it was discovered that plaintiff was suffering from prostate cancer.  On January 4, 2008, plaintiff was returned to CSP-Solano for treatment of his prostate cancer.  However, after his return to CSP-Solano plaintiff was forced to file two inmate grievances in order to obtain treatment for his prostate cancer.

Plaintiff claims that the defendants have denied him adequate medical care in violation of the Eighth Amendment and seeks injunctive relief, as well as general, special and
/////

2

1  punitive damages.  (Amend. Compl. (Doc. No. 13) at 11-20.)[1]

2  **PROCEDURAL HISTORY**

3  On May 14, 2009, the court ordered the United States Marshal to serve plaintiff's

4  amended complaint on defendants Rohrer, Rallos, Traquina, and Basi.  (Doc. No. 14.)

5  Defendants Rohrer, Rallos and Traquina filed an answer on September 14, 2009 .  (Doc. No. 18.)

6  On September 17, 2009, the undersigned issued a discovery order.  (Doc. No. 19.)  On November

7  10, 2009, defendant Basi filed an answer.  (Doc. No. 24.)

8  On April 9, 2010, counsel for defendants Rohrer, Rallos and Traquina filed a

9  motion for summary judgment, arguing that those defendants were entitled to entry of judgment

10  in their favor because: (1) there is no evidence that they were deliberately indifferent to plaintiff's

11  serious medical need; and (2) they are entitled to qualified immunity.  (Doc. No. 30.)  On that

12  same day, counsel for defendant Basi filed a motion for summary judgment also arguing that: (1)

13  there is no evidence that defendant Basi was deliberately indifferent to plaintiff's serious medical

14  need; and (2) defendant Basi is entitled to qualified immunity.  (Doc. No. 31.)

15  Plaintiff filed an opposition to the motion for summary judgment filed on behalf

16  of defendants Rohrer, Rallos and Traquina on June 23, 2010.  (Doc. No. 44.)  Defendants Rohrer,

17  Rallos and Traquina filed a reply on June 28, 2010.  (Doc. No. 46.)  On that same date, plaintiff

18  filed an opposition to defendant Basi's motion for summary judgment.  (Doc. No. 47.)

19  Defendant Basi filed a reply on July 1, 2010.  (Doc. No. 49.)

20  **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

21  Summary judgment is appropriate when it is demonstrated that there exists "no

22  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

23  matter of law."  Fed. R. Civ. P. 56(c).

24  /////

25

26  [1] Page number citations such as this one are to the page number reflected on the court's
CM/ECF system and not to page numbers assigned by the parties.

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

whatever is before the district court demonstrates that the standard for entry of summary

judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the

opposing party to establish that a genuine issue as to any material fact actually does exist.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

establish the existence of this factual dispute, the opposing party may not rely upon the

allegations or denials of its pleadings but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material, in support of its contention that the

dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

1   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

2   1436 (9th Cir. 1987).

3           In the endeavor to establish the existence of a factual dispute, the opposing party

4   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

5   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

6   versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

7   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

8   genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

9   committee's note on 1963 amendments).

10          In resolving the summary judgment motion, the court examines the pleadings,

11  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

12  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

13  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

14  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

15  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

16  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

17  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

18  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

19  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

20  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

21  'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

22                        **OTHER APPLICABLE LEGAL STANDARDS**

23  I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

24          The Civil Rights Act under which this action was filed provides as follows:

25          Every person who, under color of [state law] . . . subjects, or causes
            to be subjected, any citizen of the United States . . . to the
26          deprivation of any rights, privileges, or immunities secured by the

                                            5

1    Constitution . . . shall be liable to the party injured in an action at
2    law, suit in equity, or other proper proceeding for redress.

3  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

4  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

5  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

6  (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

7  meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

8  omits to perform an act which he is legally required to do that causes the deprivation of which

9  complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

10         Moreover, supervisory personnel are generally not liable under § 1983 for the

11  actions of their employees under a theory of respondeat superior and, therefore, when a named

12  defendant holds a supervisorial position, the causal link between him and the claimed

13  constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

14  (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory

15  allegations concerning the involvement of official personnel in civil rights violations are not

16  sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

17  II.  The Eighth Amendment and Inadequate Medical Care

18         The unnecessary and wanton infliction of pain constitutes cruel and unusual

19  punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);

20  Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

21  In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove

22  that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials

23  acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v.

24  Seiter, 501 U.S. 294, 298-99 (1991).

25         Where a prisoner's Eighth Amendment claims arise in the context of medical

26  care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence

6

1  deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106.  An Eighth

2  Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need

3  and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050,

4  1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133

5  (9th Cir. 1997) (en banc).

6          A medical need is serious "if the failure to treat the prisoner's condition could

7  result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

8  McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical

9  need include "the presence of a medical condition that significantly affects an individual's daily

10 activities." Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner

11 satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v.

12 Brennan, 511 U.S. 825, 834 (1994).

13         If a prisoner establishes the existence of a serious medical need, he must then

14 show that prison officials responded to the serious medical need with deliberate indifference.

15 Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials

16 deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in

17 which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94

18 (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard

19 to medical care, however, "the indifference to his medical needs must be substantial.  Mere

20 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

21 Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

22 105-06).  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

23 negligence in diagnosing or treating a medical condition, without more, does not violate a

24 prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate

25 indifference is "a state of mind more blameworthy than negligence" and "requires 'more than

26 ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835

1  (quoting Whitley, 475 U.S. at 319).

2          Delays in providing medical care may manifest deliberate indifference.  Estelle,

3  429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

4  providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d

5  1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332,

6  1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v.

7  Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a]

8  prisoner need not show his harm was substantial; however, such would provide additional

9  support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett

10 v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

11         Finally, mere differences of opinion between a prisoner and prison medical staff

12 or between medical professionals as to the proper course of treatment for a medical condition do

13 not give rise to a § 1983 claim.  Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330,

14 332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662

15 F.2d 1337, 1344 (9th Cir. 1981).

16 III.  Qualified Immunity

17         "Government officials enjoy qualified immunity from civil damages unless their

18 conduct violates 'clearly established statutory or constitutional rights of which a reasonable

19 person would have known.'"  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting

20 Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is presented with a qualified

21 immunity defense, the central questions for the court are (1) whether the facts alleged, taken in

22 the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a

23 statutory or constitutional right and (2) whether the right at issue was "clearly established."

24 Saucier v. Katz, 533 U.S. 194, 201 (2001).

25         Although the court was once required to answer these questions in order, the

26 United States Supreme Court has recently held that "while the sequence set forth there is often

8

1   appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 555 U.S. 223,

2   ___, 129 S. Ct. 808, 818 (2009).  In this regard, if a court decides that plaintiff's allegations do

3   not make out a statutory or constitutional violation, "there is no necessity for further inquiries

4   concerning qualified immunity." Saucier, 533 U.S. at 201.  Likewise, if a court determines that

5   the right at issue was not clearly established at the time of the defendant's alleged misconduct,

6   the court may end further inquiries concerning qualified immunity at that point without

7   determining whether the allegations in fact make out a statutory or constitutional violation.

8   Pearson, 129 S. Ct. at 818-21.

9          In deciding whether the plaintiff's rights were clearly established, "[t]he proper

10  inquiry focuses on whether 'it would be clear to a reasonable officer that his conduct was

11  unlawful in the situation he confronted' . . . or whether the state of the law [at the relevant time]

12  gave 'fair warning' to the officials that their conduct was unconstitutional." Clement v. Gomez,

13  298 F.3d 898, 906 (9th Cir. 2002) (quoting Saucier, 533 U.S. at 202).  The inquiry must be

14  undertaken in light of the specific context of the particular case.  Saucier, 533 U.S. at 201.

15  Because qualified immunity is an affirmative defense, the burden of proof initially lies with the

16  official asserting the defense.  Harlow, 457 U.S. at 812; Houghton v. South, 965 F.2d 1532, 1536

17  (9th Cir. 1992); Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir. 1989).

18                  **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

19  I.  Defendants' Statement of Undisputed Facts and Evidence

20         Defendants statement of undisputed facts is supported by citations to declarations

21  signed under penalty of perjury by defendants Rohrer, Rallos, Traquina and Basi, citations to

22  copies of plaintiff's medical records, inmate appeals and health care services request forms.

23         The evidence submitted by the defendants establishes the following facts.  On

24  December 15, 2006, while housed at California State Prison Susanville, plaintiff underwent a

25  /////

26  /////

1  blood test to determine his PSA level.[2]  A PSA level under 4 ng/ml is usually considered

2  "normal" while results over 10 ng/ml are usually considered "high."  Results between 4 and 10

3  ng/ml are usually considered "intermediate."  The results of plaintiff's December 15, 2006 test

4  showed that his PSA level was 3.7.  (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 30-2)

5  12-13, 17-22, 39; Def. Basi's SUDF (Doc. No. 31-2) 1.)[3]

6          On January 19, 2007, defendant Dr. Basi treated plaintiff and ordered another

7  PSA test.  The results of that test showed that plaintiff's PSA level was 4.1.[4]  A PSA level of 4.1,

8  which is only slightly above normal, is not high enough to compel a treating physician to

9  conclude that a biopsy of the prostate would be appropriate unless the patient also suffered from

10  additional symptoms, such as frequent urination, increased urination at night, difficulty starting

11  and maintaining a steady stream of urine, blood in the urine, painful urination, difficulty in

12  achieving an erection or painful ejaculation.  (Defs.' Rohrer, Rallos and Traquina SUDF (Doc.

13  No. 30-2) 14-15, 23-25, 27, 40; Def. Basi's SUDF (Doc. No. 31-2) 2.)

14          On May 14, 2007, defendant Dr. Rohrer examined plaintiff due to his complaints

15  of chronic headaches and fatigue.  Plaintiff informed defendant Rohrer that he had been suffering

16  from migraines and that he was taking Topiramate, a medication commonly prescribed for the

17  treatment of migraine headaches.  Neither headaches or fatigue are symptoms of prostate

18  ────────────────

19      [2]  PSA is a protein produced by the cells of the prostate gland and released in very small
amounts into the bloodstream. The prostate is a gland in the male reproductive system.  Prostate

20  cancer is a form of cancer that develops in the prostate and is often diagnosed during the work-up
for an elevated PSA level. When prostate cancer develops more and more PSA is released until it
reaches a level easily detectable in the blood.  A blood test to measure PSA is considered the

21  most effective test currently available for the early detection of prostate cancer.

22      [3]  Citations to defendants' Statement of Undisputed Facts are to the specific numbered
undisputed fact asserted.

23

24      [4]  There can be different reasons for an elevated PSA level, including prostate cancer,
benign prostate enlargement, inflammation, infection, age and race.  Prostate cancer usually

25  causes no symptoms in its early stages.  If cancer is suspected, a biopsy is needed to determine
whether cancer is present in the prostate.  When a PSA level is in the intermediate range, it is

26  unlikely to alert a treating physician that a biopsy is appropriate absent the presence of other
symptoms indicative of prostate cancer.

1   problems.  Defendant Dr. Rohrer diagnosed plaintiff as suffering from depression and migraine

2   headaches.  At that time, plaintiff complained of no symptoms indicative of prostate troubles.

3   Although plaintiff's most recent lab test had shown a PSA level of 4.1, that level was only

4   slightly above normal and, absent symptoms indicating prostate trouble, plaintiff's slightly

5   elevated PSA level did not indicate that further treatment for his prostate was medically

6   necessary.  Defendant Dr. Rohrer referred plaintiff to psychiatry for his depression, prescribed

7   Topiramate and Motrin for his headaches and ordered a follow-up examination of plaintiff in

8   ninety days.  (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 30-2) 41-49.)

9           After being transferred to the Tallahatchie Correctional Center in Mississippi,

10  plaintiff was seen by a nurse practitioner on September 24, 2007.  Plaintiff was referred to a

11  urologist, although he denied any problems with urination or any other prostrate related

12  symptoms.  On October 4, 2007, the urologist examined plaintiff and diagnosed him with an

13  elevated PSA level and scheduled a biopsy.  On October 23, 2007, plaintiff underwent a

14  transrectal ultrasound biopsy that revealed plaintiff had adenocarcinoma in both lobes of his

15  prostate.  Adenocarcinoma is cancer originating in the glandular tissue.  At that time, plaintiff's

16  Gleasens score was found to be 3 in both the left and right prostate.  A Gleasens score is a system

17  of grading prostate cancer on a scale of one to five, with one being the least aggressive and five

18  being the most aggressive.  (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 30-2) 50-57;

19  Def. Basi's SUDF (Doc. No. 31-2) 3.)

20          Plaintiff was next examined by medical personnel at the Tallahatchie Correctional

21  Center on December 27, 2007 and it was determined that he was well enough to return to

22  California for treatment of his prostate cancer.  Plaintiff was received at CSP-Solano on January

23  4, 2008.  That same day plaintiff underwent a new-arrival screening and it was noted that

24  plaintiff had been diagnosed as suffering with prostate cancer.  An order was written for him to

25  be seen on the doctor's line.  (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 30-2) 58-60.)

26  /////

1    On February 19, 2008, at CSP-Solano, plaintiff was seen by medical staff

2 concerning complaints of back pain.  However, plaintiff was not experiencing pain at the time of

3 the examination and he reported no pain when he urinated.  Plaintiff was prescribed the pain-

4 reliever Motrin.  On March 4, 2008, plaintiff had a consultation with a urologist and it was noted

5 that his prostate cancer, based on the biopsy results, was both very rare and very low grade.

6 Plaintiff was experiencing no symptoms indicative of prostate cancer, such as urinary difficulties.

7 At that time, plaintiff was diagnosed as suffering from prostate cancer that was likely of a low

8 risk.  The urologist decided to check plaintiff's current PSA level.  It was determined by medical

9 staff that if plaintiff's PSA level was found to be less than 20, treatment would be recommended,

10 because it would be highly unlikely that plaintiff's prostate cancer had metastasized, i.e., spread

11 to other organs in the body.  The treatment recommended in that case, and preferred by plaintiff,

12 would be a robotic prostatectomy.  (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 30-2)

13 64-72.)[5]

14    On April 30, 2008, plaintiff underwent a robotic radical prostatectomy, i.e. the

15 removal of all or a part of the prostate.  The procedure was successful and plaintiff's prostate

16 cancer appeared to be contained.  On May 1, 2008, plaintiff returned to CSP-Solano and

17 defendant Dr. Rohrer ordered that he be provided the treatment recommended by the operating

18 physician, which included a prescription for the antibiotic Levaquin, the pain-reliever Tylenol

19 with Codeine, the stool softener Colace, and a follow-up examination in six days.  On May 5,

20 2008, it was noted that plaintiff was status post- robotic prostatectomy and his dressing was

21 cleaned and changed.  (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 30-2) 29, 73-78, 80;

22 Def. Basi's SUDF (Doc. No. 31-2) 4.)

23 /////

24

25    [5] Neither party has presented the court with evidence reflecting the results of this 2008
PSA test.  Presumably, however, the results indicated a level of less than 20 since further
26 treatment of plaintiff's condition was undertaken.

On May 12, 2008, defendant Dr. Rallos prepared a response to an inmate appeal submitted by plaintiff complaining that his PSA test was out of range and that he was not being treated for his prostate condition.  Defendant Dr. Rallos reviewed plaintiff's appeal, his medical records and the decision at the informal level of review.  Defendant Dr. Rallos determined that plaintiff's PSA level at the time the January 24, 2007 test was administered was only slightly above normal and not high enough to alert a treating physician to order a biopsy, absent other symptoms.  Defendant Dr. Rallos also determined that, since submitting his appeal, plaintiff had undergone a prostatectomy and was receiving follow-up medical care on a regular basis. Defendant Dr. Rallos partially granted plaintiff's inmate appeal apparently based on the rationale that well after the fact plaintiff's earlier PSA test results had been explained to him.  Defendant Dr. Rallos did not personally meet with plaintiff during the course of preparing the response to plaintiff's appeal at the first formal level of review because he had already been interviewed by another doctor.  (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 30-2) 81-86.)

Plaintiff was seen again by CSP-Solano medical staff on May 12, 2008, concerning complaints of painful urination.[6]  At that time it was noted that plaintiff had undergone a prostatectomy and the treatment plan was to check his PSA level post-surgery. When plaintiff was seen on May 20, 2008 it was noted that his PSA level had decreased to 0.3.[7] (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 30-2) 30-31, 87-89; Def. Basi's SUDF (Doc. No. 31-2) 5.)

Plaintiff was next examined by a doctor on May 28, 2008.  He was diagnosed at that time as suffering with dysuria (painful urination), and it was noted that he had completed a course of the antibiotic Levaquin.  Plaintiff was also diagnosed with urinary incontinence and it

---

[6] A common side effect of a prostatectomy is painful urination during the healing process.

[7] Following a prostatectomy a patient's PSA level will drop to near zero if the surgery is successful and the cancer has not spread.

1    was ordered that he be provided a diaper.[8]  Plaintiff was also referred to urology for a follow-up

2    and prescribed the pain reliever Ibuprofen.  On June 10, 2008, plaintiff was seen by a doctor and

3    it was noted that his dysuria had resolved.  (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No.

4    30-2) 33, 90-94.)

5              On June 23, 2008, defendant Dr. Traquina prepared a response at the second

6    formal level of review to plaintiff's inmate appeal regarding his early PSA test and his

7    subsequent treatment.  Defendant Dr. Traquina reviewed plaintiff's appeal, his medical records

8    and the decisions rendered at the lower levels of administrative review.  Defendant Dr. Traquina

9    concluded that plaintiff's PSA level at the time of his January 24, 2007 test was only slightly

10    above normal and not high enough to alert a treating physician to order a biopsy in the absence of

11    other symptoms.  Defendant Dr. Traquina determined that plaintiff's appeal was partially granted

12    because, since submitting it, plaintiff had received the appropriate treatment and was being seen

13    for follow-up medical care on a regular basis.  Defendant Dr. Traquina did not personally meet

14    with plaintiff during the course of preparing the response to his appeal at the second formal level

15    of review because plaintiff had already been interviewed by another doctor.  (Defs.' Rohrer,

16    Rallos and Traquina SUDF (Doc. No. 30-2) 95-99.)

17              On August 15, 2008, plaintiff was again seen by a doctor at CSP-Solano.  A

18    urinalysis and PSA test were ordered and plaintiff was referred to a urologist.  The urinalysis was

19    negative, indicating there was no infection, and plaintiff's PSA level was less than 0.1, indicating

20    that the prostatectomy had been successful and that his cancer had been contained.  Defendant

21    Dr. Rohrer examined plaintiff on September 5, 2008.  Defendant Dr. Rohrer diagnosed plaintiff

22    as being status post-prostatectomy with a referral to urology pending and ordered a follow-up

23    examination of plaintiff in sixty days.  (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 30-

24    2) 100-05, 108-09.)

25

26         [8] Urinary incontinence is a common side effect of a prostatectomy.

1          On September 18, 2008, defendant Dr. Rohrer examined plaintiff due to a

2   complaint of dysuria and ordered another urinalysis and a follow-up.[9]  The urinalysis was

3   negative.  On October 14, 2008, defendant Dr. Rohrer renewed plaintiff's prescription for

4   Tylenol.  Defendant Dr. Rohrer also examined plaintiff on October 24, 2008 and November 13,

5   2008, and diagnosed plaintiff as being post-prostatectomy with a urology examination pending.

6   (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 30-2) 38, 110-15.)

7          Plaintiff was next examined by a urologist on November 17, 2008.  At that time

8   plaintiff was diagnosed with prostate cancer that was in remission, mild stress incontinence and

9   Peyronie's disease.[10]  The urologist recommended that plaintiff continue to perform Kegel

10  exercises to strengthen his pelvic muscles in order to treat his urinary incontinence.  The

11  urologist wanted to see plaintiff again in four months and decided not to treat the Peyronie's

12  disease, because most cases spontaneously resolve.  (Defs.' Rohrer, Rallos and Traquina SUDF

13  (Doc. No. 30-2) 120-25.)

14         Defendant Dr. Rohrer again examined plaintiff on November 25, 2008 and noted

15  the findings of the urologist.  Defendant Dr. Rohrer ordered that plaintiff have another follow-up

16  with the urologist and ordered another PSA test.  Defendant Dr. Rohrer examined plaintiff again

17  on December 19, 2008 and noted that plaintiff was scheduled for a regular follow-up with the

18  urologist.  This was the last time that defendant Dr. Rohrer was involved in plaintiff's medical

19  care.  (Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 30-2) 126-27, 130-32.)

20  II.  Defendants' Arguments

21         Defense counsel argues that defendants Dr. Rohrer, Dr. Rallos, Dr. Traquina and

22  Dr. Basi are entitled to summary judgment in their favor with respect to plaintiff's Eighth

23  Amendment inadequate medical care claim because there is no evidence that they were

24  ───────────────

25  [9] Because dysuria is also a common symptom of urinary infection, a urinalysis will commonly be ordered to determine whether the patient has an infection.

26  [10]  Peyronie's disease is an abnormal curvature of the penis.

1   deliberately indifferent to plaintiff's serious medical need.  Defense counsel also argues that the

2   defendants are entitled to qualified immunity.  (Defs.' Rohrer, Rallos and Traquina Mem. of P. &

3   A. (Doc. No. 30-1) at 14-21; Def. Basi Mem. of P. & A. (Doc. No. 31-1) at 4-8.)

4          First, defense counsel contends that there is no evidence before the court that

5   defendant Dr. Basi was deliberately indifferent to plaintiff's serious medical needs.  Counsel

6   contends that the evidence before the court establishes that, unless the patient complains of other

7   symptoms suggesting that he may be suffering from prostate cancer, the appropriate treatment in

8   response to a 4.1 PSA test level is to continue to regularly monitor the patient's symptoms and

9   PSA level.  According to defense counsel, a biopsy is not medically indicated or necessary when

10  the patient's PSA level is only 4.1 and there are no other symptoms.  In this regard, counsel

11  argues that defendant Dr. Basi was not deliberately indifferent to plaintiff's serious medical

12  needs for failing to order a biopsy of plaintiff's prostate in response to his 4.1 PSA level.  (Def.

13  Basi Mem. of P. & A. (Doc. No. 31-1) at 5-7.)

14         Similarly, defense counsel contends that when defendant Dr. Rohrer examined

15  plaintiff on May 14, 2007, and reviewed his PSA test results, the 4.1 PSA level was not high

16  enough to alert defendant Dr. Rohrer that additional testing, such as a biopsy, was appropriate in

17  the absence of other symptoms typical of a prostate condition.  Defense counsel contends that the

18  evidence before the court establishes that as of May 14, 2007, plaintiff presented no such

19  additional symptoms.  Indeed, according to defense counsel, when plaintiff was examined by a

20  urologist on March 4, 2008, the urologist noted that plaintiff's particular prostate cancer was both

21  very rare and very low grade.  Moreover, counsel argues, an earlier biopsy would not have

22  changed the outcome of plaintiff's medical treatment, because plaintiff eventually underwent a

23  prostatectomy which successfully treated and contained his prostate cancer, the same procedure

24  he would have undergone had a biopsy been performed at an earlier date.  (Defs.' Rohrer, Rallos

25  and Traquina Mem. of P. & A. (Doc. No. 30-1) at 16-18.)

26  /////

1    Second, defense counsel contends that there is no evidence before the court that

2    defendants Dr. Traquina or Dr. Rallos knew of or disregarded any excessive risk to plaintiff's

3    health.  Specifically, counsel argues that defendants Dr. Traquina and Dr. Rallos never met

4    plaintiff, never physically examined him, and that their involvement was limited to the

5    preparation of responses to his inmate appeal after he had already undergone his prostatectomy.

6    At that time, these defendants determined that plaintiff was receiving the appropriate care and

7    treatment for his medical needs.  (Defs.' Rohrer, Rallos and Traquina Mem. of P. & A. (Doc. No.

8    30-1) at 18-19.)

9    Finally, counsel for the defendants argues that each of them are entitled to

10   qualified immunity.  Specifically, counsel contends that the evidence in this case does not

11   establish that the defendants violated plaintiff's constitutional rights.  In addition, counsel

12   contends that a reasonable person in the defendants' respective positions could have reasonably

13   believed that their conduct in connection with plaintiff's medical care was lawful.  (Defs.'

14   Rohrer, Rallos and Traquina Mem. of P. & A. (Doc. No. 30-1) at 19-21; Def. Basi Mem. of P. &

15   A. (Doc. No. 31-1) at 7-8.)

16   III.  Plaintiff's Opposition

17   Plaintiff's opposition to defendants' motion for summary judgment is not

18   supported by any documents, other than a reproduction of the facts enumerated in the defendants'

19   motions for summary judgment, expressly admitting or denying each fact.  With respect to

20   defendant Dr. Basi, plaintiff contends that the elevation in his PSA level from 3.7 on December

21   15, 2006, to 4.1 on January 19, 2007, should have indicated to defendant Dr. Basi that further

22   testing was required.  Plaintiff also asserts in conclusory fashion and without citing any

23   supporting evidence, that defendant Dr. Basi deliberately ignored plaintiff's elevated PSA level

24   to facilitate plaintiff's transfer to a prison outside of California in order to satisfy a quota for such

25   transfers.  (Pl.'s Opp'n to Def. Basi's Mot. for Summ. J. (Doc. No. 47) at 2-3.)

26   /////

1    With respect to defendants Dr. Rhorer, Dr. Rallos and Dr. Traquina, plaintiff

2  contends that the majority of facts asserted in support of their motion for summary judgment are

3  undisputed by plaintiff because they occurred after he had received treatment for his prostate

4  cancer.  In this regard, plaintiff contends that the defendants have ignored plaintiff's central

5  claim, specifically that the defendants ignored all indications that he may have had prostate

6  cancer so that they could transfer him to an out-of-state prison to fulfill a contractual quota.

7  (Pl.'s Opp'n to Defs.' Rohrer, Rallos and Traquina Mot. for Summ. J. (Doc. No. 44 at 2.)

8  IV.  Defendants' Reply

9    In reply, counsel for defendants restate their contention that plaintiff has failed to

10  present any evidence that any of the defendants were deliberately indifferent to his serious

11  medical needs and that, even if plaintiff were able to establish a violation of his constitutional

12  rights, the defendants are entitled to qualified immunity.  ( Defs.' Rohrer, Rallos and Traquina

13  Reply (Doc. No. 46) at 1-5; Def. Basi Reply (Doc. No. 49) at 1-7.)

14  **ANALYSIS**

15  I.  Plaintiff's Serious Medical Need

16    Based on the evidence presented by the parties in connection with the pending

17  motions for summary judgment, the undersigned finds that a reasonable juror could obviously

18  conclude that plaintiff's prostate cancer constituted a serious medical need requiring medical

19  treatment.  See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable

20  doctor or patient would find important and worthy of comment or treatment; the presence of a

21  medical condition that significantly affects an individual's daily activities; or the existence of

22  chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for

23  medical treatment."); see also Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the

24  Eighth Amendment duty to provide medical care applies "to medical conditions that may result

25  in pain and suffering which serve no legitimate penological purpose.").  Specifically, given the

26  inherent health risks posed by cancer a reasonable juror could obviously conclude that the failure

1    to treat plaintiff's prostate cancer could result in "further significant injury" and the "unnecessary

2    and wanton infliction of pain."  See, e.g., McGuckin, 974 F.2d at 1059.  Accordingly, resolution

3    of the pending motions hinges on whether, based upon the evidence before the court, a rationale

4    jury could conclude that the defendants responded to plaintiff's serious medical need with

5    deliberate indifference.  Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

6    II.  Defendants' Response to Plaintiff's Serious Medical Need

7                    The court finds that the defendants have borne their initial responsibility of

8    demonstrating that there is no genuine issue of material fact with respect to the adequacy of the

9    medical care provided to plaintiff.  First, with respect to Dr. Rallos and Dr. Traquina, while

10   plaintiff alleged in his amended complaint that Dr. Traquina actually reviewed the results of his

11   PSA tests and nonetheless failed to ensure that plaintiff received adequate medical care, plaintiff

12   has failed to provide this court with any evidence to support that assertion.  Similarly, plaintiff

13   alleged in his amended complaint that he had medical appointments with Dr. Rallos in 2007, at

14   which time Dr. Rallos allegedly reviewed plaintiff's PSA results.  However, the record is now

15   clear that there is in fact no dispute between the parties that Dr. Rallos and Dr. Traquina's

16   involvement in plaintiff's medical care was limited to the preparation of responses to his inmate

17   appeals after plaintiff had his prostatectomy and that Dr. Rallos and Dr. Traquina never

18   personally examined plaintiff.[11]  More importantly, one aspect of plaintiff's inadequate medical

19   care claim is his contention that he should have been informed that his PSA level was 4.1 soon

20   after those results were reported and that he should have undergone further testing, specifically a

21   prostate biopsy, in response to that early PSA test result.  However, it is undisputed that Dr.

22   Rallos and Dr. Traquina did not become involved in plaintiff's medical care by reviewing his

23   inmate appeals until after his biopsy and subsequent prostatectomy, at which time plaintiff was

24

25          [11]  It appears that Dr. Rallos was scheduled to examine plaintiff on March 30, 2007, but
     plaintiff did not appear for his appointment and no medical examination took place.  (Dec. Def.
26   Rallos (Doc. No. 30-9) at 2.

already receiving regular follow-up medical care.  At that time Dr. Rallos and Dr. Traquina could not have provided any further response to plaintiff's serious medical need.  (Am. Complaint (Doc. No. 13) at 14-15, 17; Defs.' Rohrer, Rallos and Traquina Mem. of P. & A. (Doc. No. 30-1) at 18-19; Def. Rallos Ex. C (Doc. No. 30-10) at 7-8; Def. Traquina Ex. B (Doc. No. 30-8) at 7-9; Pl.'s Response to Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 45) at 16-17, 19-20, 27.)

Finally, with respect to Dr. Basi and Dr. Rohrer plaintiff has alleged that despite the rise of his PSA level from 3.7 to 4.1, Dr. Basi failed to schedule a follow-up appointment to examine plaintiff, failed to order any further testing, and failed to order any type of treatment. Plaintiff claims that because his PSA level was 4.1 Dr. Basi knew or should have known that plaintiff was suffering from prostate cancer.  Similarly, plaintiff claims that Dr. Rohrer reviewed plaintiff's medical records prior to several appointment and therefore Dr. Rohrer knew or should have known of plaintiff's elevated PSA levels and of the possibility that he was suffering from prostate cancer.  (Amen. Complaint (Doc. No. 13) at 15-16.)

However, as noted above, in order for plaintiff to establish a violation of his rights under the Eighth Amendment arising out of his medical care he must show that the defendants responded to his serious medical needs with deliberate indifference.  Farmer, 511 U.S. at 834. Here, assuming arguendo that plaintiff's assertion that Dr. Basi and Dr. Rohrer should have ordered a biopsy of his prostate in response to his PSA level rising to 4.1 in January of 2007 were true, and ignoring Dr. Basi and Dr. Rohrer's evidence and arguments to the contrary, plaintiff has not offered any evidence establishing that Dr. Basi and Dr. Rohrer purposefully disregarded plaintiff's serious medical need.  In this regard, plaintiff has not shown that Dr. Basi and Dr. Rohrer were anything more than negligent in failing to order a biopsy of his prostate in response to his 4.1 PSA level.  Of course, "mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."  Broughton, 622 F.2d at 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06).  See also Toguchi, 391 F.3d at 1057 ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights.");

1   McGuckin, 974 F.2d at 1059 (same).  Thus, "a complaint that a physician has been negligent in

2   diagnosing or treating a medical condition does not state a valid claim of medical mistreatment

3   under the Eighth Amendment."  Estelle, 429 U.S. at 106.  Even gross negligence is insufficient to

4   establish deliberate indifference to serious medical needs.  See Wood v. Housewright, 900 F.2d

5   1332, 1334 (9th Cir. 1990).

6          While it is true that a delay in providing medical care may manifest deliberate

7   indifference, Estelle, 429 U.S. at 104-05, to establish a claim of deliberate indifference arising

8   from the delay in providing care a plaintiff must show that the delay was harmful.  See Berry, 39

9   F.3d at 1057; McGuckin, 974 F.2d at 1059; Wood, 900 F.2d at 1335; Hunt, 865 F.2d at 200;

10  Shapley, 766 F.2d at 407.  This principle is crucial to resolution of the motion for summary

11  judgment pending before the court.  For, here plaintiff has admitted that in 2008, he received a

12  prostate biopsy and a prostatectomy, which are the same procedures he would have undergone

13  had his prostate biopsy been performed in 2007.  Moreover, plaintiff concedes that the

14  prostatectomy he underwent in 2008, fortunately, entirely contained his prostate cancer.  In this

15  regard plaintiff has offered no evidence establishing that in this case the delay between his

16  January 24, 2007 PSA test and his April 30, 2008 prostatectomy was harmful.  (Pl.'s Response to

17  Defs.' Rohrer, Rallos and Traquina SUDF (Doc. No. 45) at 26.)[12]

18          Given the evidence submitted by defendants Dr. Rohrer, Dr. Rallos, Dr. Traquina

19  and Dr. Basi in support of their motions for summary judgment, the burden shifts to plaintiff to

20  establish the existence of a genuine issue of material fact with respect to his claim that the

21  defendants demonstrated deliberate indifference to his serious medical need.  As noted above, to

22

23          [12]  Plaintiff is not the only one fortunate in this regard.  Were there evidence before the
    court that plaintiff's condition was exacerbated and treatment made more difficult or impossible
24  due to delay on the part of defendants, this may well have been quite a different case.  Indeed,
    defendants appear to recognize this by presenting evidence that in March of 2008, a urologist
25  with who they consulted decided to check plaintiff's PSA level and was of the opinion that only
    if it was less than 20 would treatment be recommended because otherwise plaintiff's prostate
26  cancer may well have already spread to other organs.  (Defs.' Rohrer, Rallos and Traquina SUDF
    (Doc. No. 30-2) 64-72.)

1   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

2   some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could

3   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

4   trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

5           The court has considered plaintiff's oppositions to the pending motions for

6   summary judgement and his verified complaint.  In considering defendants' motion for summary

7   judgment, the court is required to believe plaintiff's evidence and draw all reasonable inferences

8   from the facts before the court in plaintiff's favor.  Drawing all reasonable inferences in

9   plaintiff's favor, the court concludes that plaintiff has not submitted sufficient evidence to create

10  a genuine issue of material fact with respect to his claim that the defendants responded to his

11  serious medical need with deliberate indifference.  See Farmer, 511 U.S. at 834; Estelle, 429 U.S.

12  at 106.

13          Specifically, plaintiff claims that the defendants were deliberately indifferent to

14  his serious medical needs because when on January 24, 2007 it was determined that his PSA

15  level had risen to 4.1, the defendants did not order a biopsy of his prostate.  Defendants,

16  however, have submitted evidence and argued that plaintiff's 4.1 PSA level was not so high as to

17  alert them that a biopsy was medically necessary at that time because plaintiff had no additional

18  symptoms of prostate cancer.  Instead defendants contend that the appropriate medical treatment

19  in response to plaintiff's PSA level in January of 2007 was simply to monitor his symptoms and

20  his PSA level.

21          Thus, plaintiff and defendants have a difference of opinion as to the appropriate

22  course of medical treatment.  (Pl.'s Response to Def Basi's Mot. for Summ. J (Doc. No. 47) at 2-

23  3; Defs.' Rohrer, Rallos and Traquina Reply (Doc. No. 46) at 2; Def. Basi Reply (Doc. No. 49) at

24  3-4.)  As a matter of law, a mere difference of opinion between a prisoner and prison medical

25  staff as to the proper course of medical treatment for a condition does not give rise to a

26  cognizable § 1983 claim.  See Estelle, 429 U.S. at 107 ("A medical decision not to order an X-

1  ray, or like measures, does not constitute cruel and unusual punishment."); Toguchi, 391 F.3d at

2  1058; Jackson, 90 F.3d at 332; Fleming v. Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D. Cal.

3  2006) ("Plaintiff's own opinion as to the appropriate course of care does not create a triable issue

4  of fact because he has not shown that he has any medical training or expertise upon which to base

5  such an opinion."). Plaintiff's disagreement with defendants as to the appropriate medical

6  response to his PSA level in January of 2007, without more, is insufficient to survive defendants'

7  motion for summary judgment.[13]

8         Here, plaintiff has tendered no competent evidence demonstrating that the course

9  of treatment pursued by defendants was medically unacceptable under the circumstances. Most

10  importantly, as noted above, plaintiff has failed to present any evidence that the course of

11  medical treatment employed by defendants or the delay in implementing that course of treatment

12  caused him any identifiable harm. Finally, plaintiff has provided this court with no competent

13  evidence demonstrating that the defendants chose their diagnosis and course of treatment of his

14  condition in conscious disregard of an excessive risk to plaintiff's health.

15         Accordingly, for all of the foregoing reasons, the court concludes that the

16  undisputed evidence before the court establishes that defendants Dr. Rohrer, Dr. Rallos, Dr.

17  Traquina and Dr. Basi were not deliberately indifferent to plaintiff's serious medical need and are

18  entitled to summary judgment in their favor with respect to plaintiff's Eighth Amendment

19  inadequate medical care claims.[14]

20

21         [13]  The fact that in October of 2007 a urologist who saw plaintiff upon his transfer to the
   Tallahatchie Correctional Center in Mississippi, diagnosed him with an elevated PSA level and
22  scheduled a biopsy, arguably establishes a difference of medical opinion. However, a difference
   of medical opinion between doctors does not give rise to a constitutional violation. See Toguchi,
23  391 F.3d at 1059-60 ("Dr. Tackett's contrary view was a difference of medical opinion, which
   cannot support a claim of deliberate indifference."); Sanchez, 891 F.2d at 242 (difference of
24  opinion between medical personnel regarding the need for surgery does not amount to deliberate
   indifference to a prisoner's serious medical needs).

25

26         [14]  In light of this recommendation, the court need not address defendants' argument that
   they are entitled to summary judgment in their favor on qualified immunity grounds.

**CONCLUSION**

Accordingly, IT IS HEREBY RECOMMENDED that:

1.  Defendants Rohrer, Rallos and Traquina's April 9, 2010 motion for summary judgment (Doc. No. 30) be granted;

2.  Defendant Basi's April 9, 2010 motion for summary judgment (Doc. No. 31) be granted; and

3. This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 18, 2011.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:6
mendez2727.SJ

24